UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JANE DOE**, *et al.*,

        **Plaintiffs,**

  **v.**

**OHIO HI-POINT SCHOOL DISTRICT
BOARD OF EDUCATION**, *et al.*,

        **Defendants.**

**Case No. 2:20-cv-4798
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

The facts in this case are complicated, serious, and upsetting. Plaintiffs Jane Doe, her mother Mary Doe, her father John Doe, and sister Jenny Doe filed an 84-page, 18-count complaint challenging various forms of gender- and disability-based harassment and discrimination that Jane Doe allegedly endured while attending the Ohio Hi-Point Center ("Hi-Point"), a vocational school, in Bellefontaine, Ohio. Plaintiffs seek compensatory, punitive, declaratory, injunctive, and other relief against 48 different named and unnamed Defendants. During discovery, Jane Doe testified that during her two months as a Hi-Point student, she was bullied, harassed, assaulted, battered, and raped by her fellow peers. The parties submitted evidence consisting of hundreds of exhibits and many deposition transcripts to the Court.

Despite the troublesome facts and complex record, the primary issue addressed in this Opinion and Order is whether the Hi-Point Defendants[1]—the Board and individuals who held

---

[1] Hi-Point Defendants collectively refers to: Ohio Hi-Point School District Board of Education (the "Board"), Rick Smith, Tonya N. Ramey, Jon Cook, John Wilson, Robin Harrington, Jaclyn Atherton, Melissa Gonglik, Kaitlyn King, Caleb Lang, and Amy McCarthy. (MSJ, ECF No. 122, PageID 3089 n. 1.) The individual Hi-Point Defendants are named in their individual and official capacities. (*Id.*) In its Answer, the Board states it is a public entity and a political subdivision

positions within the school system—are liable for the conduct Jane Doe testified various students committed against her. As described below, a school district may be liable for sexual assaults and harassment by one student against another if the school district had actual knowledge of such conduct and was deliberately indifferent to it. Otherwise, a school district is not liable for the actions of the offending student. The Court takes Jane Doe's rape allegations very seriously. But the issue before the Court is whether the Hi-Point Defendants were deliberately indifferent to Jane Doe's plight.

The following motions are before the Court: State Farm Fire and Casualty Company's Motion for Default Judgment and/or Summary Judgment of Intervenor and Reply in Further Support (ECF Nos. 54, 105), Hi-Point Defendants' Motion for Summary Judgment (MSJ, ECF No. 122) and Hi-Point Defendants' Motion to Strike (Mot. to Strike, ECF No. 141). The Court **GRANTS** the Motion for Summary Judgment on Plaintiffs' federal claim, and **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' state-law claims and **DISMISSES** them **WITHOUT PREJUDICE.** The Court **DENIES** the Motion to Strike, and **DENIES AS MOOT** State Farm's Motion for Default Judgment and/or Summary Judgment and Reply.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on September 16, 2020, a little less than a year after Jane Doe left Ohio Hi-Point Center. (Compl. ECF No. 3.) Named Defendants can be separated into three factions: (i) the Board, administrators, and teachers affiliated with Hi-Point[2] (ii) Jane Doe's

---

under the laws of the State of Ohio which receives federal financial assistance in the operation of the vocational school. (Answer, ECF No. 16, ¶ 7.)

[2] This included the Hi-Point Defendants and John/Judy Roes #1–10 (Compl.), but Plaintiffs voluntarily dismissed without prejudice the claims against John/Judy Roes #1–10 after the Court issued a show cause order (ECF Nos. 187, 188).

student peers at Hi-Point;[3] and (iii) Jean Williams, who, at the time, was the guardian of Minor Student 1, but has been terminated as a party since this lawsuit was filed. (Compl.; ECF No. 23.)

Plaintiffs' counts are summarized here:

- Count 1 – against the Hi-Point Defendants for violating substantive due process under the 14th Amendment

- Count 2 – against the Hi-Point Defendants for violating Title IX of the Civil Rights Act, 20 U.S.C. § 1681 (sex discrimination)

- Count 3 – against the Hi-Point Defendants for violating Plaintiff Jane Doe's constitutional rights under 42 U.S.C. § 1983 and *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)

- Count 4 – against all Defendants for negligence/gross negligence

- Count 5 – against the Hi-Point Defendants for breach of duty of care and supervision

- Count 6 – against all Defendants for intentional infliction of emotional distress

- Count 7 – against all Defendants for negligent infliction of emotional distress

- Count 8 – against all Defendants for violating Ohio's anti-hazing statute, Ohio Rev. Code § 2307.44

- Count 9 – against Ms. Williams and the Hi-Point Defendants for failing to report child abuse in violation of Ohio Rev. Code § 2151.421

- Count 10 – against Hi-Point Defendants for breach of contract

- Count 11 – against Hi-Point Defendants for violating Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 *et seq.*

- Count 12 – against Hi-Point Defendants for violating the Rehabilitation Act of 1973, 29 U.S.C. § 794.

- Count 13 – against Minor Student 1 and Minor Student 2 for assault and battery

---

[3] This included Minor Student 1, Minor Student 2, and John/Judy Roes #11–33 (Compl), but Plaintiffs voluntarily dismissed without prejudice the claims against John/Judy Roes #11–33 after the Court issued a show cause order (ECF Nos. 187, 188).

- Count 14 – against Minor Student 1 and Minor Student 2, which seeks to impose civil liability on both under Ohio Rev. Code § 2307.60 for the alleged rapes

- Count 15 – against all Defendants for loss of consortium

(Compl. PageID 141–69.)

In Counts 16, 17, and 18, Plaintiffs make requests for punitive damages, declaratory judgment, and injunctive relief. (*Id.* PageID 169–73.) These are not free-standing claims, but requests for relief, and so the Court will construe them as such. *Jones v. U.S. Bank Natl. Assn.*, Case No. 1:16-cv-778, 2017 WL 2191629, at *9 (S.D. Ohio May 17, 2017) (dismissing plaintiffs' claim for injunctive relief absent other independent claims, as an injunction is a remedy dependent on a successful independent claim and not itself a free-standing claim); *City of Cincinnati v. Kentucky Transp. Cabinet*, Case No. 1:16-cv-488, 2017 WL 4386379, at *3 (S.D. Ohio Sep. 29, 2017) (dismissing plaintiffs' claim for declaratory judgment where there was no controversy between the parties); *City of Cincinnati v. Deutsche Bank Nat. Tr. Co.*, 897 F. Supp. 2d 633, 645 (S.D. Ohio 2012) (dismissing free-standing claim for punitive damages, as no such independent claim is recognized).

## I. Motion to Dismiss

While most of Defendants answered the Complaint (ECF Nos. 16, 41), Ms. Williams and Minor Student 1 moved to dismiss (ECF No. 23). The Court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims against Ms. Williams, finding because those "would implicate enough unique factual issues and distinct forms of evidence, their adjudication in this action would 'substantially predominate' over Plaintiffs' federal-law claims." (ECF No. 67, PageID 562–64.) But the Court did not reach the same finding for any of the state-law claims asserted against Minor Student 1. (*Id.* PageID 563.) The Court held, despite Minor Student 1

4

urging otherwise, that it saw "no persuasive reason to dismiss Plaintiffs' Civil Rape Claim against [Minor Student 1] pursuant to § 1367(c)." (*Id.* PageID 567.)

Minor Student 1 also moved to dismiss Count 8, which Plaintiffs brought against all Defendants for violating Ohio's anti-hazing statute, and the Court found that the allegations did not plausibly state a claim for relief under Ohio Revised Code § 2307.44. (ECF No. 67, PageID 570.) The Court dismissed the claim without prejudice and gave Plaintiffs ten days from the date of the order to attempt to amend their claim. (*Id.*) Plaintiffs did not attempt to amend Count 8. Thus, Count 8 against Minor Student 1 is **DISMISSED WITHOUT PREJUDICE.**

## II.   Intervenor State Farm

Creating another procedural wrinkle, State Farm Fire and Casualty Company moved for leave to intervene in June 2021. (ECF No. 42.) It had issued a Homeowners Policy to the parents of Minor Student 2 in effect for the policy period from June 9, 2019 through June 9, 2020. (*Id.* ¶ 7; Policy, ECF No. 54-1.) This Court granted State Farm's motion for leave to intervene (ECF No. 43), and State Farm filed its Intervenor Complaint (ECF No. 44). State Farm seeks a declaration from this Court that it owes no duty to defend or indemnify Minor Student 2 against the claims asserted by Plaintiffs because any injury to Jane Doe was not caused by an "occurrence" as defined under the Policy. (*Id.*)

State Farm then moved for default judgment, citing the lack of response by any party to its Intervenor Complaint. (ECF No. 54.) Alternatively, State Farm sought summary judgment. (*Id.*) The Court denied that Motion as to Hi-Point Defendants and Plaintiffs but held in abeyance the Motion as to Minor Student 2. (ECF No. 89.) The Court found that Minor Student 2 had shown good cause to warrant an extension of time to respond to State Farm's Motion (*id.*), and gave him an extension of 45 days from the date of its Opinion and Order "to (i) obtain insurance coverage counsel to defend the claims set forth within State Farm's Intervening Complaint;

(ii) file an Answer to State Farm's Intervening Complaint out of time; and (iii) respond to State Farm's Motion for Default Judgment and/or Summary Judgment." (*Id*. PageID 635.) When Minor Student 2 did not do any of the above, State Farm filed a reply reiterating its request that the Court grant either default judgment or summary judgment in its favor and declare that it owes no duty to defend or indemnify Minor Student 2 against Plaintiffs' claims. (ECF No. 105, PageID 781.)

State Farm's Motion and Reply are addressed below.

### III.    Minor Student 1

On July 26, 2022, the attorneys of record for Minor Student 1 filed a Motion to Withdraw as Counsel. (ECF No. 71.) They represented that Minor Student 1 is now deceased and that they had not been retained to continue representation by a duly appointed personal representative of their client. (*Id*.) The attorneys' Motion was granted. (ECF No. 75.) No representative has since appeared on Minor Student 1's behalf, but the claims against Minor Student 1 remain.

With that procedural background, the Court turns to the facts.

### STATEMENT OF ESSENTIAL FACTS

The briefing on the Motion for Summary Judgment and Motion to Strike spans around 400 pages, without exhibits, of which there are over 600. (*See* MSJ, Mot. to Strike, ECF Nos. 114, 127, 128, 140, 151, 152.) Included in those 600 exhibits are hundreds of surveillance videos. (ECF Nos. 114, 127.) The Court has reviewed the record; below, it summarizes only the necessary facts to furnish the appropriate background to the reader.

In the late summer of 2019, Jane Doe, an eighteen-year-old high school student living near Bellefontaine, Ohio, applied for admission to Hi-Point and was admitted into its diesel program. (Jane Doe Dep., ECF No. 160 at 12; Gonglik Dep., ECF No. 162 at 53:10–13.) The year before, Jane Doe had attended the Ohio Virtual Academy. (ETR, ECF No. 127, Ex. 2A, at

1.) She began classes at Hi-Point on August 30, 2019, which was two weeks after the school year had begun, and Hi-Point received Jane Doe's Individualized Education Plan (IEP) from her parents about five days after the start of the school year. (Jane Doe Dep. 154:12–18; Gonglik Dep. 66:3–7; Mary Doe Dep., ECF No. 164 at 164:1–21, 194:3–21; Harrington Dep., ECF No. 161 at 47:3–7.)

## I.    Jane Doe's IEP

IEPs are developed from Evaluation Team Reports (ETR), which assess academic performance, general intelligence, and other characteristics. (ETR 8/30/2019, ECF No. 122-1 at 11.) These Plans explain accommodations that individuals with disabilities might need. (*Id*. at 17, 27, 28.)

Before entering school at Hi-Point, Jane Doe completed testing that revealed her full-scale IQ was 83, representing the "low average" range of intelligence. (*Id.* at 12.) The full scale IQ is an average of three different IQs—verbal, nonverbal, and spatial. (*Id.* at 12–13.) Jane Doe's verbal IQ—a measure of her ability to understand the written and spoken word—was 104, which was average. (*Id.*) Her nonverbal IQ—a measure of her ability to recognize steps, patterns, and rules (like math operations)—was 70, which was below average. (*Id.*) Her spatial IQ—or her ability to visualize things, problem solve, and think ahead—was 83, which is in the low average range. (*Id.*) Jane Doe had a specific learning disability in reading fluency and mathematics. (Smith Dep., ECF No. 155, at 103:16–19, 104:3–8.)

Hi-Point Defendants and Plaintiffs disagree as to whether Jane Doe went to her teachers for help or accommodations, and whether she did or did not receive help or necessary accommodations under her IEP. Plaintiffs assert and highlight testimony that they say supports that Jane Doe was not receiving accommodations she needed. (Memo. Contra PageID 2570.) Hi-Point Defendants claim and point to testimony indicating that accommodations were available to

Jane Doe in all of her classes and that she was receiving the appropriate accommodations under her IEP. (MSJ PageID 212.)

For example, Plaintiffs point to deposition testimony from John Wilson, Jane Doe's diesel lab instructor, where he testified that he "would ask the whole class does anyone want to go somewhere else to take a test" because he "didn't want to pick them out individually." (Memo. Contra PageID 2570; Wilson Dep., ECF No. 154 at 43:22–44:4.) Plaintiffs also highlight Robin Harrington's (Hi-Point's Special Education Coordinator) deposition testimony explaining that she did not learn of Jane Doe until early September when Jane Doe's Algebra II teacher called her and asked if Jane Doe was on an IEP. (Memo. Contra PageID 2570, Harrington Dep. 40.)

Hi-Point Defendants highlight testimony supporting that when they learned that Jane Doe was struggling in her Algebra II class, and upon receiving and reviewing her IEP, they transferred her to Basic Algebra II. (Jane Doe Dep. 157:14–21, 463:8–16; Harrington Dep. 40:11–16, 43:20–44:14, 48:22–24, 264:3–10.) Basic Algebra II was a small group class taught by an intervention specialist. (Harrington Dep. 25:18–26:6, 40:12–14, 273:20–24.)

The Court turns next to Jane Doe's claims of harassment by her peers.

## II.   Minor Student 1

Jane Doe had begun dating a Hi-Point student, Minor Student 1, shortly before beginning the school year. (Jane Doe Dep.121:20–23.) She testifies that only two weeks after starting at Hi-Point on the weekend of September 13–15, 2019, she was raped and held against her will by Minor Student 1, her then-boyfriend. (*Id.* 315:20–316:5.)

Jane Doe "broke up with" Minor Student 1 on September 16, and testifies that Minor Student 1 began sexually harassing her at Hi-Point after September 16. (*Id.* at 162, 248, 300.) She stated he "wouldn't take no for an answer" and wouldn't stop grabbing her thighs, butt,

vagina, breasts, arms, and throat. (*Id.* 165:24–167:8.) Witness interview notes taken during a later launched Title IX investigation support Jane Doe's testimony. (*See, e.g.*, ECF No. 127, Exs. 175, 200.)

Hi-Point Defendants argue the evidence paints a different picture: that Jane Doe and Minor Student 1 remained in a consensual relationship typical of teenagers through late September. (MSJ PageID 2153–55 (citing deposition testimony, exhibits, and video footage); *see also* ECF No. 114, Exs. 10, 11.)

## III.    Jane Doe Reports the Harassment and Hi-Point Takes Action

On September 30, 2019, Jane Doe and Julian Meeker (another student) met with Hi-Point's Dean of Students, Jon Cook, to report concerns of harassment by Minor Student 1. (Cook Dep., ECF No. 157 at 91:2–9, 111:18–20, 134:13–18; Smith Dep. 72:9–73:8, 179:7–9; ECF No. 127, Ex. 194 at p. 1.) Mr. Cook took written statements from both Jane Doe and Julian Meeker. (ECF No. 127, Exs. 182, 194, 195, 196.) Jane Doe's statement is dated the morning of September 30, 2019, signed by her and Mr. Cook, and reads:

> [Minor Student 1] was my Boyfriend. I broke up with him and he started touching me inappropriately touching my butt and other places when I have told him to stop countless times. [T]han on social media he publicly bashed my family and my new boyfriend. Even got some of my friends against me. He would also always look over my shoulder of who I was talking to.

(ECF No. 122-31) (errors in original).

The parties do not debate that Jane Doe and Julian Meeker made these statements to Mr. Cook, but they dispute *when* Jane Doe first reported the harassment by Minor Student 1 to Mr. Cook. Jane Doe says it was right away—she gave a list of the dates she says she went to Mr. Cook to complain to Director Tonya Ramey during an in-person meeting on October 7, 2019. (Mary Doe Dep. 209:15–23; ECF No. 122-3.) The dates on that list are September 17, 18, 23, 26, and 30 and October 1 and 2, 2019. (ECF No. 122-3.) Plaintiffs also offer evidence that on

September 16, Mary Doe called Melissa Gonglik, Hi-Point's counselor, and explained that Jane

Doe had run away with Minor Student 1, came home with hickeys on her neck, and that Minor

Student 1 was not welcome in her home. (ECF No. 127, Ex. 88.) Hi-Point Defendants put forth

evidence (including surveillance video footage) that Jane Doe made her first report about Minor

Student 1 on September 30, 2019. (MSJ PageID 2152, 2127; Cook Dep. 91:2–9, 111:18–20,

134:13–18.)

      Mr. Cook spoke with Minor Student 1 and gave him a verbal warning on October 1, the

day after Jane Doe and Julian Meeker made their written statements. (ECF No. 127, Ex. 194.)

Minor Student 1 denied that he had touched Jane Doe inappropriately. (*Id.*) On October 2, Mr.

Cook and Ms. Ramey met with Jane Doe and her parents, and Mr. Cook issued orders of no

contact between Jane Doe and Minor Student 1 and between Julian Meeker[4] and Minor Student

1. (*Id.* Ex. 8.) Minor Student 1's lunch and advisory period were changed on October 7, 2019.

Jane Doe and Minor Student 1's class schedules were changed on October 9, 2019, after which

they no longer had any classes or lunch together at Hi-Point, although they did still ride the bus

together to and from their home school district.[5] (Ramey Dep., ECF No. 153 at 144:16–20; Cook

Dep. 183:7–184:24, 209:14–210:21; Smith Dep. 175:21–24; Harrington Dep. 115:10– 118:11,

264:11–24, 303:20–304:3; ECF No. 127, Exs. 5, 78, 79; Jane Doe Dep. 299:24–300:5; Mary Doe

Dep. 290:2–7; 757:6–9; Gonglik Dep. 191:7–192:17.)

---

[4] Around the same time, Mr. Cook had also received an allegation that Jane Doe had consensual sex with Julian Meeker in the school bathroom on September 30. (Cook Dep. 162:9–17; ECF No. 122, Exs. 194, 196.) Jane Doe and Julian Meeker were both suspended for five days as a result. (Jane Doe Dep., 291:10–15; Mary Doe Dep., 679:12–15; Cook Dep. 165:21–24.)

[5] Because Jane Doe's home school district was Bellefontaine City Schools, she was still a Bellefontaine student while attending Hi-Point, and had to ride the Bellefontaine bus to get to Hi-Point. (Mary Doe Dep. 155:24-156:3, 158:20-23; Harrington Dep. 20:16-18.)

Hi-Point appointed Ms. Ramey as the Title IX investigator, and she began the investigation on October 3, 2019. At that time, Jane Doe had made two complaints: one of harassment by Minor Student 1 and one of retaliation by Mr. Cook, so Mr. Cook was removed for any additional investigating. Ms. Ramey conducted around 44 interviews, including interviews of 28 students (some were interviewed more than once), as well as staff members and adults in the school. (Ramey Dep. 64:13, 96:6–15, 125:7–14, 239:22, 109:2–3, 140:6–7; Harrington Dep. 305:5–10.) Ms. Ramey also looked at various other forms of evidence, including videos. (Ramey Dep. 120:18–121:2.)

Despite the schedule changes, Jane Doe reported that she was scared to walk in the hallways because Minor Student 1 continued to harass and bully her. (Jane Doe Dep. 474:8–18.)

The parties do not debate that on October 7, during the same in-person meeting with Ms. Ramey, Jane Doe first made allegations to the school that Minor Student 1 had forced himself on her and forced her to do things "sexually" during the weekend of September 13. (Jane Doe Dep. 315:20–317:6; *see also* MSJ PageID 2145.)

On November 4—Jane Doe's last day physically attending Hi-Point—the school appointed an adult support person to escort her to and from her classes and throughout the hallways. (Jane Doe Dep. 354:6–16; Smith Dep. 152:19–153:2, 176:5–13; Harrington Dep. 94:10–16, 119:14–120:3, 276:2–12.)

## IV. Title IX Report

On December 5, 2019, Ms. Ramey provided her report to Hi-Point's Superintendent, Dr. Rick Smith ("Dr. Smith"), who provided his report of the findings and recommendations to Jane Doe on December 10, 2019. (Smith Dep. 133:9–134:9; *see also* ECF No. 122-9.) Dr. Smith's December 10 letter summarized the four complaints that were investigated throughout the Title IX investigation:

11

1. that Jane Doe reported to Mr. Cook five times before September 30, 2019, and her requests for action were dismissed and/or ignored;

2. Mr. Cook retaliated against Jane Doe by disciplining her with a five-day suspension after she reported harassment;

3. Between September 16, 2019 and September 30, 2019, Jane Doe was a victim of a hostile education environment due to the sexual violence and harassment she was subjected to by another student, Minor Student 1; and

4. On October 31, 2019, Jane Doe was bullied and harassed by other Ohio Hi-Point students.

(ECF No. 122-9.)

The letter continued and informed Jane Doe that after a review of the complaints, the evidence gathered, and the applicable policies, Dr. Smith fully adopted Ms. Ramey's findings and conclusions and found, using a preponderance of the evidence standard, that there was insufficient evidence that a violation of Ohio Hi-Point's 3362 Anti-Harassment Title IX policy had occurred in any of those four complaints. (ECF No. 122-9.) The letter addressed each of the four complaints, drawing the conclusions below:

1. The evidence gathered and reviewed did not support that Jane Doe reported concerns to Mr. Cook before September 30 or that Mr. Cook knew anything about suspected harassment until the September 30 meeting;

2. The evidence gathered and reviewed did not support a finding of retaliation against Jane Doe, and her Code of Conduct violation and her report of harassment to Mr. Cook were two incidents which were unrelated to one another;

3. The evidence gathered and reviewed did not support a determination that Jane Doe experienced a hostile educational environment and/or sexual harassment during the dates listed in the complaint; and

4. The evidence gathered and reviewed did not support a finding that Jane Doe was subjected to bullying and harassment in violation of the student code of conduct.

(ECF No. 122-9.)

Despite such findings "Investigator suggest[ed] recommendations to ensure a safe and productive education learning environment" including:

A.  All staff will be informed to immediately report any harassment by a student to the Dean of Students and followed up by that staff member to ensure the Dean has been informed;

B.  Continue the "Order of No Contact" between the Complainant and Respondent.

C.  Provide an adult escort for the Complainant upon return to school to prevent any harassment or conflict with any other OHP students.

D.  Maintain the current academic schedule that was previously changed to ensure the Complainant and Respondent do not have any classes together.

E.  Maintain a standing protocol of Complainant going directly to OHP Counselor Mrs. Gonglik and/or Director Mrs. Ramey with any concerns.

F.  Monitor the formal warnings and students who have received them regarding comments made to or had conversation about the Complainant.

(*Id.*)

The letter ended by explaining that the decision could be appealed to the Board of Education with a written statement within five business days. (*Id.*) Jane Doe did not appeal the findings in the report. (Jane Doe Dep. 406:24–407:1; Mary Doe Dep. 399:13–17; 400:10–15.)

## V.  **Minor Student 2**

Jane Doe testified that she was raped by another Hi-Point student, Minor Student 2, at school on October 30. During the diesel lab, when the instructor was assisting other students, Jane Doe testified that Minor Student 2 raped her in a lab tool crib (a place where tools are stored). (Jane Doe Dep. 727.) The tool crib was not locked then, and it was dim inside. (*Id.* 718, 748:22–49:1.)

Jane Doe told no one that day; she testified that she was scared. (*Id.* 618.) In her deposition, she stated that she did not report this second rape to Hi-Point staff. (*Id.* 900:16–901:01.)

Two students from the class, however, went to Ms. Ramey the next day about the incident. (Ramey Dep. 157:4–21.) One student spoke to Ms. Ramey and the other spoke to Caleb Lang. (*Id.* at 159:1–18.) The student who spoke with Ms. Ramey reported Jane Doe and Minor Student 2 had sex in the tool crib, and Jane Doe had asked her and the other student to be lookouts. (*Id.* 162:1–6, 9–13.) Ms. Ramey talked with Minor Student 2 on October 31, and he admitted that he and Jane Doe had sex in the tool crib. (*Id.* 164:2–5.) When Jane Doe was asked about the incident around the same time, she denied anything had happened, including sexual contact. (Jane Doe Dep. 330:18–24, 472:14–19, 781:1–7; Mary Doe Dep. 689:6–22, 690:20–24; Ramey Dep. 342:14–19; Smith Dep. 159:16–17.)

After an investigation into this matter, Jane Doe and Minor Student 2 were suspended for five days. (Jane Doe Dep. 351:9–22; Minor Student 2 Dep. 35:19; Cook Dep. 205:17–206:23; Smith Dep. 159:1–17; *see* MSJ PageID 2166.)

## VI. Jane Doe Leaves Hi-Point After About Two Months

November 4 (a Monday) was Jane Doe's last day physically attending Hi-Point. (Jane Doe Dep. 154.) Although she was enrolled through the 2019 school year, Jane Doe did not return to the Hi-Point building. (*Id.* at 154:23–155:01.) Hi-Point kept sending Jane Doe work she was missing and attempted to schedule IEP and ETR meetings. (*See* MSJ PageID 2167–74 (citing deposition testimony and exhibits).)

With this background, the Court turns to the pending motions.

14

**MOTION TO STRIKE**

In their Motion to Strike, Hi-Point Defendants challenge assertions Plaintiffs make in their Memorandum Contra and five attached affidavits of Faith Moyer, Jane Doe, Mary Doe, Wesley Foor, and Julian Meeker. (Mot. to Strike; *see* ECF Nos. 129, 130, 131, 131-1, 131-2.) Hi-Point Defendants appear to be requesting that the Court strike Plaintiffs' entire 150-page Memorandum Contra. (*Id.*) They make five arguments in support of this request: (1) Plaintiffs cannot rely on speculation, conclusory allegations, and unsubstantiated assertions to avoid summary judgment; (2) Plaintiffs cannot rely on inadmissible hearsay to avoid summary judgment; (3) Plaintiffs cannot rely on sham affidavits that contradict their previous sworn testimony to avoid summary judgment; and (4) Plaintiffs cannot create an issue of fact "by providing false or contradictory testimony about things that are contradicted by the physical fact." (Mot. to Strike.) Plaintiffs opposed (ECF No. 151) and Hi-Point Defendants replied (ECF No. 152).

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The determination of whether to strike a filing rests within the sound discretion of the Court. *See Wausau Benefits v. Progressive Ins. Co.*, 270 F. Supp. 2d 980, 985 (S.D. Ohio 2003) (M.J. King). Motions to strike are generally disfavored and considered remedies that "should be sparingly used by the courts." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

The Court will not take the drastic measure of striking Plaintiffs' Memorandum Contra. To the extent Plaintiffs make speculative, conclusory, or unsubstantiated assertions, relies on inadmissible hearsay, or provides false or contradictory testimony, the Court can simply disregard such statements and evidence.

As for Hi-Point Defendants' third argument, which relate to the affidavits, the five witnesses were deposed before the close of discovery and each stated that he or she could not recall certain facts. (Moyer, Meeker, Foor Deps. ECF Nos. 177, 184, 176, respectively.) Video and documentary evidence was turned over after the close of discovery, however, and the affiants recalled with the benefit of refreshed recollections. (Moyer, Jane Doe, Mary Doe, Meeker Aff., ECF Nos. 129–31.) Most of the contradictions Hi-Point Defendants point to are of such sort. To the extend the affidavits do genuinely contradict statements made in prior deposition, Plaintiffs "may not create a factual issue for the purpose of defeating a motion for summary judgment." *Jones v. Gen. Motors Corp*., 939 F.2d 380, 385 (6th Cir. 1991) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986); *Biechele v. Cedar Point, Inc*., 747 F.2d 209, 215 (6th Cir.1984).)

As a result, Hi-Point Defendants' Motion to Strike is **DENIED.**

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### Federal Claims

The Court addresses preliminary matters. At various places in Plaintiffs' Memorandum Contra, they concede that certain claims fail. The following is a list of their concessions:

- There is no individual liability under the ADA or § 504 of the Rehabilitation Act. (Memo. Contra PageID 2589, 2698); *see Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999).

- There is no individual liability under Title IX. (Memo. Contra PageID 2630, 2698); *see Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009).

Summary Judgment on Counts 2, 11, and 12 against the individual Hi-Point Defendants in their individual capacities is **GRANTED.** The only federal claim that remains against the Hi-Point Defendants in their individual capacities is the § 1983 substantive due process claim.

Plaintiffs argue about an equal protection claim in their Memorandum Contra. (PageID 2654–55.) In Plaintiffs' 84-page Complaint, they mention "equal protection" one time:

> "This civil rights action is brought under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; Individuals with Disabilities Education Act (IDEA); Title IX of the Education Amendments of 1972, as amended; Mandatory Reporting Requirements under R.C. §5123.01; 34 U.S.C. §20341 for violations of the Child Abuse Protection Act; 42 U.S.C. §1983 for violations of substantive due process and **equal protection** under the Fourteenth Amendment; violations of the right to

free speech under the First and Fourteenth Amendments; . . . .[6] (Compl. PageID 94) (emphasis added). Plaintiffs did not include an equal protection count. (*Id.*)

Plaintiffs have failed to meet Federal Rule of Civil Procedure 8(a)'s fair notice requirement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that a complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action). This case has also been pending since September 2020, and so Plaintiffs had opportunity to amend to add an equal protection claim and did not. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 456 (6th Cir. 2008) (affirming the lower court and declining to address plaintiff's arguments about procedural due process where plaintiff never amended his complaint to assert such a claim). Moreover, new claims cannot be raised in response to a motion for summary judgment. *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) and 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)).

## I.    Title IX (Count 2)

Jane Doe[7] brings a claim for sex discrimination under Title IX, stating that she suffered harassment on the basis of her sex. (Compl. ¶¶ 238–48.) The Board contends the Court should

---

[6] Nor do Plaintiffs ever develop a free speech violations claim in their briefing. (*See* Memo. Contra.)

[7] While Title IX claims are not limited to students and employees, and can be brought any person who is denied the benefit of an educational program or activity provided by a qualifying institution, such a "nonstudent like" plaintiff who has not experienced sex discrimination while participating or trying to participate in an educational program lacks standing to pursue such claims. *See Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 707 (6th Cir. 2022), *cert. denied sub nom. Ohio State Univ. v. Snyder-Hill*, 143 S. Ct. 2659, 216 L. Ed. 2d 1237 (2023). Because the family member Plaintiffs do not attempt to bring this claim on Jane Doe's behalf as a minor or based on sex discrimination they experienced at Hi-Point, only Jane Doe has standing to bring the Title IX claim.

grant it summary judgment on this claim too because most of the harassment and bullying was not based on sex and was not severe and pervasive enough, and it was not deliberately indifferent to the reports of harassment. (MSJ PageID 2192.) Jane Doe disagrees, arguing the sex harassment she experienced at Hi-Point was severe and pervasive, and that the Board's response to her reports of that harassment were "callous, insufficient, and ineffective amounting to deliberate indifference." (Memo. Contra PageID 2630, 2641.)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Two types of sex-based discrimination are covered by the statute: (1) a school's direct interference with a student's participation in an education program on the basis of sex; or (2) similar indirect inference based on the school being "deliberately indifferent to known acts of student-on-student sexual harassment." *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020) (en banc) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 647 (1999)). This case involves the second type.

In *Davis*, the Supreme Court of the United States established three prima facie elements for a Title IX claim based on student-to-student harassment: "(1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (summarizing *Davis*'s holding)).

### A.  Severe, Pervasive, and Objectively Offensive Sexual Harassment

The parties disagree about whether Jane Doe can show there are issues of material fact as to element (1). The Board argues the harassment and bullying (by classmates other than Minor Students 1 and 2) that Jane Doe describes does not rise to the level of severe, pervasive, and offensive, but is more like teasing and name-calling, which is not enough under Title IX. (MSJ PageID 2194.) As for Minor Student 2, the Board argues that Jane Doe's story shifted:

> When two students reported that Jane Doe had asked them to be lookouts while she went to the tool crib with Minor Student 2, Jane Doe actually denied that anything had happened between her and Minor Student 2, including any sexual contact. (Jane Doe Dep., Vol. 2, 330:18-24; Jane Doe Dep., Vol. 3, 472:14-19; Jane Doe Dep., Vol. 4, 781:1-7; May Doe Dep., Vol. 3, 689:6-22, 690:20-24; Ramey Dep., Vol. 2, 342:14-19; Smith Dep. 159:16-17). Now, Jane Doe has changed her original story and alleges that she was raped in the tool crib by Minor Student 2 on October 30, 2019. (Jane Doe Dep., Vol. 2, 328:13-21; Jane Doe Dep., Vol. 4, 611:19-23; Jane Doe Dep., Vol. 5, 870:22-871:1; Mary Doe Dep., Vol. 3, 706:23-707:10). She admits, however, that she never reported the alleged rape to anyone at Ohio Hi-Point or claimed that she had been raped in the tool crib. (Jane Doe Dep., Vol. 2, 332:12-19, 353:22-354:5; Jane Doe Dep., Vol. 3, 472:14-19; Jane Doe Dep., Vol. 4, 709:23-710:2, 727:18-21; Jane Doe Dep., Vol. 5, 843:6-11, 900:16-901:1; *see also* Ramey Dep., Vol. 2, 343:4-7; Cook Dep. 215:21-23; Harrington Dep., Vol. 2, 302:10-12; Smith Dep. 173:4-8).

(*Id.* PageID 2195–96.) They also assert the single incident with Minor Student 2 was not pervasive. (*Id.*) As for Minor Student 1, the Board points out it has no liability for events that took place off-campus over the weekend of September 13. (*Id.* PageID 2196.) And seemingly conceding Jane Doe was harassed by Minor Student 1 after that weekend, it asserts it was not deliberately indifferent to such harassment. (*Id.*)

Jane Doe retorts by recounting the testimony about Minor Student 1's repeated harassment after the weekend of September 13. (Memo. Contra PageID 2630–32.) She summarizes testimony including about how Minor Student 1 was "inappropriately touching her butt, and other places and when she [told] him to stop, he [would] not," and how he was "forcing her to do certain things she did not want to do and was trying to kiss her." (*Id.* PageID 2632.)

20

Minor Student 1 grabbed her thighs, butt, vagina, boobs, throat, and arms. (*Id.* PageID 2632; *see also* Jane Doe Dep. 166:7–22.) Jane Doe testified there were "a lot of people calling [her] names" including "bathroom slut, whore, STD, and AIDS." (Jane Doe Dep. 171.) Interview notes taken by Ms. Ramey during her Title IX investigation support Jane Doe's testimony that Minor Student 1 was often physical with her. (ECF No. 127, Exs. 175, 200.)

The record includes much evidence of harassment and bullying that, when viewed in a light most favorable to Jane Doe, demonstrates that she has evidence to support that she was sexually harassed—at the very least by Minor Student 1—and that such harassment was severe, persuasive, and objectively offensive. (MSJ PageID 2630–41.)

The question left to answer is whether the Board was deliberately indifferent to Jane Doe's situation.

## B. Deliberate Indifference

In *Davis*, the Supreme Court announced the infrequent circumstances under which an entity covered by Title IX could be held liable for peer-to-peer harassment. Schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 454 (6th Cir. 2008) (citing *Davis*, 526 U.S. at 650). "A school district that is sued for peer-on-peer harassment, the Supreme Court explained, is not held liable for the actions of the harassing students, but instead is held liable for its own 'deliberate indifference' to the students' harassing acts." *Id.* (citing *Davis*, 526 U.S. at 641–42).

The alleged facts in *Davis* are instructive, too. The Supreme Court found the plaintiff had stated a cognizable claim of deliberate indifference "[w]hen a fifth-grade boy waged a months-

21

long campaign of sexual harassment against a girl who sat next to him in class, the school did almost nothing." *Foster*, 982 F.3d at 965 (summarizing *Davis*). The harassment included vulgar statements, occurred in the classroom and under a teacher's supervision, the victim's grades suffered and she contemplated suicide, and despite the victim's "quick and frequent reporting, the school took 'no disciplinary action' and failed to make 'any effort' to separate the harasser from the victim." *Id.* at 965–66 (same). The school did not even "permit the victim to change desks until after three months of reported harassment" and failed to respond in any way over a five-month period. *Id.* at 966 (same).

Since *Davis*, the Sixth Circuit and district courts within have provided more guidance. "'[D]eliberate indifference' means that the defendant both knew and consciously disregarded the known risk to the victim." *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 621 (6th Cir. 2019); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Schools are deliberately indifferent to harassment when they behave in a manner that is "clearly unreasonable in light of what [they] knew." *Kesterson v. Kent State Univ.*, 967 F.3d 519, 528 (6th Cir. 2020). This deliberate indifference must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable" or "subjected" to it. *Doe v. Ohio Univ.*, No. 2:21-CV-00858, 2023 WL 2652482, at *7 (S.D. Ohio Mar. 27, 2023) (citing *Davis*, 526 U.S. at 643–44). That said, the institution need not "remedy" the harassment, *Davis*, 526 U.S. at 648, or "engage in a particular disciplinary action." *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009). Instead, a school is liable only if its efforts amounted to "an official decision . . . not to remedy the violation." *Davis*, 526 U.S. at 642.

The Sixth Circuit has summarized cases in which schools have lost in Title IX cases:

> Now compare these circumstances to cases in which the schools lost. In *Vance v. Spencer County Public School District*, harassers "touched [a middle school girl]

inappropriately" in "virtually every class" for over a year. 231 F.3d 253, 257 (6th Cir. 2000). Despite repeated complaints by the victim and her mother to school officials, they responded only with a string of verbal warnings. "[T]he more [the victim and her mother] complained," the more the harassment "seemed to increase." *Id.* In that context, we found the school's pattern of non-responses deliberately indifferent. *Id.* at 262–63. Likewise, in *Patterson v. Hudson Area Schools*, the victim suffered years of "persistent harassment" that included "daily" bullying, physical assault, and sexual assault. 551 F.3d 438, 439, 442, 448 (6th Cir. 2009). We found a cognizable claim of deliberate indifference because the school's "only response" to the victim and his mother's pleas for help was to "employ the same type of verbal reprimands" that had already come up short. *Id.* at 449.

*Foster*, 982 F.3d at 967–68.

Compare this with cases in which courts have found schools were not deliberately indifferent. In *Foster*, the Sixth Circuit held that a university was not deliberately indifferent when it "ratcheted up protections for [the plaintiff]: from a no-contact order after the first complaint to a requirement that the harasser stay in a separate hotel for the program's last three-day session to a removal from the third day of the session to an order that he not attend graduation." *Id.; see also Stiles v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016) (finding no deliberate indifference where administrators investigated specific complaints of harassment, gave verbal warnings to harassers or temporarily suspended them, separated the victim in class from students known to bother him, revised the victim's class schedule, and approved the hiring of a substitute teacher to monitor the victim in school but failed to eliminate harassment over a one-and-a-half-year period); *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 323–24 (6th Cir. 2017) (no deliberate indifference where school investigated student's complaints, and responded with verbal reprimands and temporary suspensions).

Mindful of this precedent, the Court examines the actions of the Board. The parties dispute whether Jane Doe made her first report of harassment by Minor Student 1 on September 17, 2019 (Jane Doe's position) or September 30, 2019 (the Board's position). Viewing the facts

23

in a light most favorable to Plaintiffs, the Court will proceed assuming the harassment was reported on September 17. Jane Doe concedes that she did not alert the school that she was raped at that time; the first time she alleged that she was raped to school officials was on October 7, 2019. Assuming the harassment was reported on September 17,[8] about two weeks went by before the school took action.

On September 30, Mr. Cook took written statements by Jane Doe and Julian Meeker about the alleged harassment. The next day, the school met with Minor Student 1 to discuss the allegation and give him a verbal warning. On October 2, the school issued no contact orders between Minor Student 1 and Jane Doe and notified teachers. Then, on October 3, the school began its Title IX investigation. The investigation included:

- 44 interviews with witnesses;

- Review of evidence;

- Meeting with Jane Doe and her parents more than once;

- Meeting with Minor Student 1 and his guardian about Jane Doe's allegations;

- Notifying the Bellefontaine Police Department about the alleged rape of Jane Doe by Minor Student 1;

- On October 7, changing Minor Student 1's lunch and advisory periods;

- On October 9, modifying Minor Student 1's and Jane Doe's class schedules so that they would no longer have classes together;

- Reaching out to and speaking with Bellefontaine City Schools about harassment on the bus and requesting the students be separated;

- On November 4, assigning Jane Doe to a support person to escort her to and from her classes and through the hallways;

---

[8] The parties seem to agree that on September 10, 2019, Jane Doe reported to Ms. Gonglik and Mr. Cook, that a different male student was sexually harassing her by text message, and that Mr. Cook met with the student and the school separated the student and Jane Doe in class. (*See* MSJ PageID 2127; Memo. Contra PageID 2641.)

- Disciplining students whom Jane Doe complained were harassing and bullying her; and

- Proposing alternatives to in-person schooling.

These actions do not amount to deliberate indifference to Jane Doe's plight.

Jane Doe argues from that September 17 until September 30, despite making multiple reports to Mr. Cook and Ms. Gonglik of sexual harassment by Minor Student 1, the school did nothing.[9] Importantly both parties agree that at that time the school did not know that Jane Doe was raped the weekend of September 13. The time from September 17 to September 30 amounts to shy of two weeks, and in light of Sixth Circuit precedents and the subsequent actions taken by Hi-Point Defendants, does not amount to deliberate indifference. *Contra Davis*, 526 U.S. at 649 (school failed to respond over a five-month period); *Vance*, 231 F.3d at 257 (victim was touched by harassers for over a year and despite her and her parent's repeated complaints, school only responded with verbal warnings); *Patterson*, 551 F.3d at 449 (despite years of harassment including bullying, physical assault, and sexual assault, school's only response was verbal reprimands).

To support her deliberate indifference element, Jane Doe points to her deposition testimony where she states Ms. Ramey laughed at her when she said Minor Student 1 raped her during the October 7 meeting. (Memo. Contra. PageID 2645.) But the Board disputes this, and offers evidence in the form of a recording that contradicts Jane Doe's testimony where Mary Doe is heard asking Ms. Ramey was what funny and why she was smiling. Ms. Ramey replied,

---

[9] As mentioned above, Hi-Point Defendants dispute this and contend Jane Doe did not report Minor Student 1's harassment until September 30. They also offer school hallway surveillance footage from September 27 that Jane Doe testified about during her deposition. The videos show Jane Doe and Minor Student 1 being affectionate in the school hallways. (Jane Doe Dep. 225–231; ECF No. 114, Exs. 10, 11.) These videos raise fact questions, but because the Court finds these fact questions not to be material for purposes of determining whether the school was deliberately indifferent, they are not appropriate for a jury in the context of the Title IX claim.

explaining that nothing was funny, she tried to make everyone feel comfortable, she had smiled at another person in the room who she knew was tired and was trying to encourage. She also stated she tried to get to the bottom of the allegations and protect Jane Doe. (ECF No. 144, Ex. 24 at 1:33:30–1:36:34); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the high value of video footage in resolving factual disputes between the parties); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *7 (6th Cir. Mar. 15, 2023) (Readler, J., concurring in part and dissenting in part) (explaining that "[w]ith the benefit of body camera video capturing the relevant events, the parties' respective descriptions of the engagement take a back seat" and courts "'view the facts in the light depicted by the videotapes.'") (citing *Rudlaff v. Gillespie*, 791 F.3d 638, 639 (6th Cir. 2015) (cleaned up)).

Jane Doe also contends that Ms. Ramey's Title IX investigation "was a subterfuge to deflect responsibility for ongoing sexual harassment at [Hi-Point] under her watch." (Memo. Contra PageID 2649.) To support this position, Jane Doe highlights the result of Ms. Ramey's Title IX investigation and suggests that the school should have retained an independent third party to conduct the investigation. (*Id.* 2649–51.)

As to the independent third party, Jane Doe cites one case in support, where an independent investigator was brought in to conduct the investigation; she cites no precedent, statute, or regulation that requires a school to bring in an independent third party to conduct the investigation. (Memo. Contra PageID 2651); *see Fulton v. W. Brown Local Sch. Dist. Bd. of Educ.,* No. 1:15-CV-53, 2016 WL 6893845, at *4 (S.D. Ohio Nov. 23, 2016).

As for the results of the Title IX investigation, Jane Doe relies on Ms. Ramey's conclusions in it that Jane Doe did not face a hostile educational environment, sexual harassment, or bullying in violation of school policies. There is tension between Jane Doe's

testimony and the school's findings, but that tension does not demonstrate the Board was deliberately indifferent. Despite the findings of Ms. Ramey, she made several recommendations "to ensure a safe and productive learning environment" including alerting staff to Jane Doe's reports, continuing the no contact orders between Minor Student 1 and Jane Doe, providing Jane Doe an adult escort, and maintaining the changed academic schedules for Minor Student 1 and Jane Doe to ensure they did not have class together. (ECF No. 122-9.)

As for Jane Doe's testimony about Minor Student 2 raping her on October 30, and argument that Hi-Point Defendant's deliberate indifference somehow resulted in that rape: the evidence on the record makes such logic too attenuated to create an issue of fact. Jane Doe testified that she did not have issues with Minor Student 2 before October 30; she had not talked with him much. (Jane Doe Dep. 812:8–13.) She testified that he had been nice to her before October 30. (*Id.* 871:2-4, 871:12-19.) Further, she had not claimed to anyone at Hi-Point about Minor Student 2 or reported any issues with him before or after October 30. (*Id.* 871:20-872:3; Wilson Dep. 160:3-8.)

In sum, Jane Doe attended Hi-Point for about two months. The school spent about a month and a half of those two months investigating her complaints of sexual harassment and bullying. The school took many steps to attempt to keep Jane Doe safe—from no contact orders to changing class schedules to meetings and many interviews to attempting to change her busing situation. These actions do not demonstrate conscious disregard to known risk to Jane Doe. *See Kollaritsch*, 944 F.3d at 621; *Brown*, 520 U.S. at 410.

Summary Judgment on Count 2 is **GRANTED.**

## II. Title II of the ADA (Count 11) and § 504 of the Rehabilitation Act (Count 12)—Disability Discrimination

Jane Doe[10] bring claims under the ADA and § 504 of the Rehabilitation Act against the Board. The Board makes two arguments about why these claims should not withstand summary judgment. First, they argue that the claims fail[11] because Jane Doe failed to exhaust mandated administrative requirements where she asserts she was denied a free and appropriate education ("FAPE"). (MSJ PageID 2175–79.) Second, they argue that (1) there was no harassment or discrimination connected with a disability, and (2) Jane Doe cannot demonstrate deliberate indifference on the part of the Board. (*Id.* PageID 2179–91.)

The Court must decide the threshold issue of whether Jane Doe indeed brings a FAPE-like claim before determining whether she failed to meet exhaustion requirements.

### A. Jane Doe alleges she was denied a FAPE.

The Board argues that although Jane Doe did not plead a separate cause of action under the Individuals with Disabilities Education Act ("IDEA"), she makes several allegations related to the denial of a free appropriate public education—more concisely known as a FAPE. (Memo. Contra, PageID 2177.) Relying on *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 157–58 (2017),

---

[10] Only Jane Doe has standing to bring claims under the ADA and § 504. It is unclear if Jane Doe's parents were trying to bring these claims on her behalf, but even they were, they lack standing to do so. *See Sorah v. Tipp City Exempted Vill. Sch. Dist. Bd. of Educ.*, 611 F. Supp. 3d 441, 450 (S.D. Ohio 2020) (Rice, J.) (mother lacked standing under the ADA and § 504 where she failed to allege that Defendants took any adverse action directly against her as the result of her advocacy); *See Burton v. Cleveland Heights-Univ. Heights City Sch. Dist. Bd. of Educ.,* No. 1:17 CV 134, 2017 WL 4348915, at *4 (N.D. Ohio Sept. 29, 2017) (explaining that mother did not have standing to assert personal claims under the ADA and the Rehabilitation Act based on violations of her child's rights). Also, while parents do enjoy rights under IDEA and are entitled to prosecute IDEA claims on their own behalf, it is uncertain Mary, Dan, and Jenny Doe are trying to do that here. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516 (2007). So the Court will treat these claims as Jane Doe's.

[11] Defendants oscillate between stating the "Does Complaint fails" because of failure to exhaust (MSJ PageID 2175) and Plaintiffs' ADA and § 504 claims fail because of failure to exhaust (*id.* PageID 2179). The Court construes Defendants' brief as arguing the latter.

they contend that because Jane Doe could not have brought the same claims if the alleged conduct had occurred at a public facility that was not a school, nor could an adult at the school have made the same complaints, they cannot avoid IDEA's exhaustion requirement. (*Id.* PageID 2178.)

IDEA ensures that children with disabilities receive needed special education services. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 157 (2017); *see* 20 U.S.C. § 1400 *et seq.* The statute offers federal funds to schools in exchange for furnishment of a FAPE "to all children with certain physical or intellectual disabilities." *Fry,* 580 U.S. at 158; *see* 20 U.S.C. § 1401(3)(A)(i).

The goal of the statute is to "provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.'" *Fry,* 580 U.S. at 170. Under IDEA, school districts are required to develop IEPs for children with disabilities. *Doe v. Ohio*, No. 2:91-CV-464, 2004 WL 7347115, at *3 (S.D. Ohio July 9, 2004) (Holschuh, J.); *see* 20 U.S.C. § 1414(d). "Each IEP sets individually-tailored goals for the student and describes specific services to be provided by the school district. It is to be reviewed each year and revised if necessary." *Doe v. Ohio*, 2004 WL 7347115, at *3; *see* 20 U.S.C. § 1414(d)(4)(A).

Jane Doe does not bring a cause of action under IDEA, but she states that she is bringing her civil rights action under the IDEA. (Compl. PageID 94; *see* PageID 102 ("Failing to take her specific disability into consideration is contrary to the spirit of IDEA, . . . .").) She references her IEP just short of 30 times in the Complaint, alleging that:

- Jane Doe is a person with a disability that made her eligible for an IEP (Compl. ¶ 3);

- Hi-Point Defendants failed to consider her disabilities when "pushing her" to choose the diesel engine program that conflicted with her abilities as noted in the IEP (*id.* ¶ 29);

- Jane Doe was forced to perform menial tasks in the diesel lab and did not receive assistance with the normal curriculum (*id.* ¶ 77); and

- Jane Doe had to teach herself for nearly a month in her English class and had to attend an upper level math class in which she did not receive any IEP accommodations (*id.* ¶ 112–13).

(*See also id.* ¶¶ 225, 235, 240, 246, 260, 273, 283, 290, 296, 303, 310, 328, 331–36, 342, 346–51.) Further, in her Memorandum Contra, Jane Doe argues that the Board discriminated against her because of her disabilities, failed to timely obtain her IEP, and eventually, disregarded it. (Memo. Contra PageID 2573.)

The Court concludes Jane Doe has alleged that she was denied a FAPE.

### B. *Fry* Test and *Perez*

The Board argues that because she brings a claim for denial of a FAPE Jane Doe was required to exhaust her administrative remedies and did not do so. (MSJ PageID 2175.) She responds that exhaustion is unnecessary where it would be futile and where she was not given full notice of her procedural rights. (Memo. Contra PageID 2577.)

The Supreme Court of the United States explained the scope of IDEA's exhaustion requirement in *Fry*. 580 U.S. 154 at 157–58. The Supreme Court explained that while § 1415(l) of IDEA makes clear that nothing in it "restricts or limits the rights or remedies that other federal laws, including antidiscrimination statutes, confer on children with disabilities," it also states that "if a suit brought under such a law seeks relief that is also available under the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures." *Id.* at 157 (cleaned up and internal citations omitted).

The Supreme Court held that "exhaustion is not necessary where the gravamen of the of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the

Act calls a 'free appropriate public education.'" *Id.* (citing § 20 U.S.C. 1412(a)(1)(A)). It provided the following guidance:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 171.

Applying such logic, the Court finds the answer to the *Fry* questions is no—Jane Doe could not have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school. *Fry* commands the courts to "avoid a 'magic words approach' and consider the 'substance, not [the] surface' of a plaintiff's claim." *L.G. by & through G.G. v. Bd. of Educ. of Fayette Cnty., Kentucky*, 775 F. App'x 227, 231 (6th Cir. 2019). Jane Doe uses the magic words here—IDEA and IEP—but more importantly, the gravamen of her claims is that when the Board "could not access her IEP due to technical difficulties, they simply threw up their hands and disregarded it." (Memo. Contra PageID 2573; *see also id.* ("Ms. Doe was placed in the wrong classes that far exceeded her abilities with no access to the accommodations she required to allow her to succeed. These accommodations were readily available at OHP; they simply were not given to Ms. Doe."); *supra* (Complaint allegations summarized).)

Jane Doe offers evidence of bullying and harassment by her Hi-Point peers. But such evidence relates to her sex, not her disability, and therefore relates to her Title IX claim, not her

ADA and § 504 of the Rehabilitation Act claims. (*See* Memo. Contra. PageID 2641–45 (chart summarizing Jane Doe's evidence of sexual harassment, sexual violence, and bullying).)

Federal courts received additional guidance from the Supreme Court about IDEA's exhaustion requirements in March 2023, in *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023). There, the Supreme Court held that where a lawsuit in federal district court under the ADA seeks backward-looking relief in the form of compensatory damages rather than equitable relief for IDEA-like claims, exhaustion is not required:

> The parties offer very different interpretations of § 1415(l). Mr. Perez reads the statute to require a plaintiff to exhaust the administrative processes found in subsections (f) and (g) only to the extent he pursues a suit under another federal law for *remedies* IDEA also provides. None of this, Mr. Perez contends, forecloses his current claim because his ADA complaint seeks only compensatory damages, a remedy everyone before us agrees IDEA cannot supply. By contrast, Sturgis reads § 1415(l) as requiring a plaintiff to exhaust subsections (f) and (g) before he may pursue a suit under another federal law if that suit seeks relief for the same *underlying harm* IDEA exists to address. On this view, the law bars Mr. Perez's ADA suit because it seeks relief for harms flowing from Sturgis's alleged past shortcomings in providing a free and appropriate public education—a harm IDEA exists to address—and Mr. Perez chose to settle his administrative complaint rather than exhaust § 1415(f) and (g)'s remedial processes.
>
> If both views are plausible ones, we believe Mr. Perez's better comports with the statute's terms.

*Perez*, 598 U.S. at 146–47.

Jane Doe seeks various forms of relief—compensatory, punitive, treble, incidental, exemplary, declaratory, injunctive, and so on—and does not tie that relief to particular claims. (Compl. PageID 171–74.) In connection with her request for injunctive relief, Jane Doe asks for a permanent injunction "ordering Defendants to stop engaging in unconstitutional and unlawful acts, and to develop policies and procedures for ending any such unconstitutional and unlawful acts the hostile and intolerant environment." (Compl. ¶ 381.) She proposes various forms of injunctive relief in a–p subparagraphs, such as implementing anti-bullying, harassment, and

discrimination training programs, guidelines, policies, and enhanced supervision, and even firing

Mr. Wilson. (*Id.*) She does not mention her FAPE or IEP in connection with her injunctive relief

request. Nor does she tie her request for compensatory and punitive damages to denial of her

FAPE. Given such ambiguity, and drawing inferences in Jane Doe's favor, the Court presumes

she seeks backward-looking relief in the form of compensatory damages in connection with her

IDEA claim, and proceed to examine the merits of these claims.

### C. Summary judgment on Jane Doe's disability discrimination claims is still warranted.

The Board argues that even if Jane Doe were not required to exhaust her administrative

remedies, her ADA and § 504 claims still do not withstand summary judgment.

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from the participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o

otherwise qualified individual with a disability in the United States . . . shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance."

29 U.S.C. § 794(a). In sum, both Acts allow disabled individuals to sue school districts that

discriminate against them because of their disability or fail to protect them from discrimination.

*Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016). Given the similarities

between the two statutes, courts merge the analyses. *Qiu v. Univ. of Cincinnati*, 803 F. App'x

831, 836 (6th Cir. 2020).

Jane Doe offers two theories of discrimination: (1) peer-to-peer harassment, and

(2) failure to accommodate.

### 1. Peer-to-Peer Harassment Theory

To succeed on her peer-to-peer harassment theory, Jane Doe must show (1) she was an individual with a disability; (2) she was harassed based on that disability; (3) the harassment was sufficiently severe or pervasive that it altered the condition of her education or created an abusive educational environment; (4) the school knew about the harassment; and (5) the school was deliberately indifferent to the harassment. *S.S. v. E. Ky. Univ.*, 532 F.3d at 454; *Doe v. Nelsonville-York Sch. Dist. Bd. of Educ.*, No. 2:20-CV-4467, 2022 WL 1539536, at *4 (S.D. Ohio May 16, 2022). The Board contends that Jane Doe does not have evidence to support the second and fifth elements of her prima facie claim.

The Court explained *supra* that the gravamen of Jane Doe's harassment claim is sex-based harassment, not disability-based harassment. There are references to students calling Jane Doe "dumb," "retarded," and "stupid," in the briefing, but those quotations come from Jane Doe's Complaint, not from Jane Doe deposition testimony (or anyone else's as far as the Court can discern).[12] (*See* Jane Doe Dep.) The names Jane Doe testifies that she remembers being called in her deposition are "slut," "whore," "STD," and "AIDS." (Jane Doe Dep. PageID 4878.) These are terrible names to be called, but they related to Jane Doe's sex, not her disability.

The absence of such evidence means that she has not identified a genuine issue of material fact as to her peer-to-peer harassment claim fails. But even if Jane Doe did have

---

[12] Jane Doe asserts that "[f]ascinatingly, Defendants' Motion for Summary Judgment itself contains the evidence that Ms. Doe was peer-harassed based on disability, stating that students called her 'dumb,' 'retard,' and 'stupid.'" (Memo. Contra PageID 2608 (citing MSJ PageID 2183).) But that page of the Defendants' Motion cites both Plaintiffs' Complaint and Jane Doe's deposition, and Jane Doe does not testify that she was called those words in her deposition. (*Id.*) Jane Doe does not direct the Court to any evidence to support this theory, and it is not the job of this Court to comb through the exhibits to find support for these allegations. *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) (stating that a district court does not have the "duty to sift through the record in search of evidence to support a party's opposition to summary judgment").

evidence to support element (2) of her peer-to-peer harassment claim, she cannot demonstrate that there is an issue of material fact as to element (5)—that the school was deliberately indifferent[13] to any such harassment for the reasons explained above in connect with her Title IX claim.

## 2. Failure-to-Accommodate Theory

Turning to Jane Doe's failure-to-accommodate theory, to prevail, she must show she "is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability." *S.S. v. E. Ky. Univ.*, 532 F.3d at 453. Jane Doe must show she has either been "subjected to discrimination or excluded from a program or denied benefits solely by reason of [her] disability." *Id.* "To prove discrimination in the education context, something more than a mere failure to provide the free appropriate education required by [the IDEA] must be shown." *Id*. (citing *Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 528–29 (4th Cir. 1998).)

The Sixth Circuit recently summarized the required showing:

[T]he plaintiff must show that the defendant reasonably could have accommodated his disability but refused to do so, *Keller v. Chippewa Cnty., Mich. Bd. of Comm'rs*, 860 F. App'x 381, 385 (6th Cir. 2021), and that this failure to accommodate

---

[13] Relying on Circuit Judge Karen Nelson Moore's concurrence in *S.S. v. E. Ky. Univ.*, Jane Doe argues that this Court should apply a negligence standard instead in the context of evaluating a school's liability in peer-to-peer harassment suits under the ADA. (Memo. Contra. PageID 2607–08); *see S.S. v. E. Kentucky Univ.*, 532 F.3d at 460 (Moore, J., concurring). Judge Moore distinguished the ADA from Title IX, and explained why she believed considerations that made the deliberate indifference standard make sense in the Title IX context did not apply in the context of the ADA. (*Id.*) Since *S.S. v. E. Ky. Univ.*, courts in this Circuit have applied the deliberate indifference standard to claims for peer-to-peer harassment in the ADA context, and this Court is precedent-bound. *See, e.g.*, *Doe v. Big Walnut Loc. Sch. Dist. Bd. of Educ.*, 837 F. Supp. 2d 742, 756 (S.D. Ohio 2011) (Smith, J.); *Ball v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:20-CV-2681, 2022 WL 594799, at *10 n.3 (S.D. Ohio Feb. 28, 2022); *Doe v. Nelsonville-York Sch. Dist. Bd. of Educ.*, No. 2:20-CV-4467, 2022 WL 1539536, at *4 (S.D. Ohio May 16, 2022).

"imped[ed] [his] ability to participate in, or benefit from, the subject program,"
[*Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 166 (6th Cir.
2003).] The plaintiff must establish both that his preferred accommodation was
reasonable, and that the accommodation provided to him was unreasonable. [*Doe
by K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1088 (6th Cir. 2023)] (citing
*Campbell*, 58 F. App'x at 166). Courts are mindful of school administrators'
educational expertise in reviewing the reasonableness of their selected
accommodations. *Id.* (citing *Campbell*, 58 F. App'x at 166–67).

*Knox Cnty. v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023).

The parties disagree about element (3). Jane Doe argues that (1) the Board failed to issue
periodic reports to her as required by her IEP; (2) the Board failed to provide her with an
intervention specialist and one-on-one instruction as her IEP required; (3) the school's special
educational coordinator failed to provide her with readily available accommodations that her IEP
said she required (e.g., Jane Doe's grades fell, she failed to progress on her IEP goals); (4) the
diesel engine instructor, John Wilson, failed to provide her with reasonable accommodations that
her IEP said she required in the diesel engine program; (5) the math instructor failed to provide
her with readily available reasonable accommodations required by her IEP; and (6) these
collective actions impeded Jane Doe's ability to participate in or benefit from Hi-Point's
services, programs, or activities.[14] (Memo. Contra PageID 2591–2604.)

The Board disagrees and addresses each of these. It argues Jane Doe fails to establish that
it could have reasonably accommodated Jane Doe's disability, but refused to do so, and that such
a failure impeded Jane Doe's ability to participate in, or benefit from, the program. (ECF No.
140, PageID 3040.) Stated simply, it argues the accommodations provided to Jane Doe were
reasonable. (*Id.*)

---

[14] Although the Court finds above that Jane Doe brings a FAPE-like claim, all of her arguments
related to IDEA and FAPE are in the context of the ADA and § 504. Jane Doe does not make
any arguments specific to the IDEA statute, and so the Court addresses her arguments within the
context of her other disability discrimination claims. (*See* Memo. Contra PageID 2591–2604.)

Jane Doe's arguments can be summarized as follows: the school failed her because (1) it failed to issue periodic progress reports; (2) it failed to provide her with an intervention specialist and one-on-one instruction; and (3) it failed to provide her with readily available accommodations. (Memo. Contra PageID 2591–2604.)

At the start, Jane Doe physically attended Hi-Point for about two months. She was suspended for at least 5 days during the same period. Hi-Point was constrained by what it could do in a limited time period.

As for periodic progress reports, in making her argument, Jane Doe relies on Ms. Gonglik's deposition testimony where she stated, "Progress Reports must be provided to parents of a child with a disability at least as often as report cards are issued to all children." (Memo. Contra PageID 2591.) The Board points to evidence of Jane Doe's report card. (ECF No. 127, Ex. 17.) They also explain that the Does received an update about Jane Doe's classroom performance during the September 19, 2019 parent teacher conferences; Jaclyn Atherton contacted Mary Doe to provide feedback on Jane Doe and express concern related to her grades; and Ms. Gonglik met with Jane Doe to discuss ways to improve her math grade. (ECF No. 140, PageID 3040; Atherton Dep., ECF No. 171, 91:3–92:23; ECF No. 127, Ex. 109.)

Next, the Board provides evidence that Jane Doe had access to intervention specialists. In her math class, Ms. Atherton had a license to teach as an invention specialist, her classroom was the intervention specialist classroom for math, and Jane Doe received one-on-one instruction and there was small group instruction. (Atherton Depo. 9:6–13, 23:4–24:4, 35:18–20,67:18–68:4; Gonglik Dep. 152:12–14.) There was also an intervention specialist assigned to Jane Doe's English class, and an intervention room that Jane Doe had access to during her time at Hi-Point. (Atherton Dep. 131:14-21; Gonglik Dep. 152:12-17.)

Jane Doe cites deposition testimony from Ms. Harrington to support her argument that she did not have an intervention specialist, but Ms. Harrington's testimony was as to the period Jane Doe was in Algebra II, and she explains that she understood Jane Doe would receive more support when transferred from the Algebra II class to the Basic Algebra II class. (Harrington Dep. PageID 273 ("she was going in the basic which has more support just by her being in that class").) Many of Jane Doe's arguments relate to a period—of about a week or two—where the school did not yet have Jane Doe's IEP. Jane Doe started school on August 30, 2019, but the school did not receive her IEP until September 5. Around the same time it received the IEP, the Algebra II teacher noticed Jane Doe was having difficulties, and thought the Basic Algebra II class would better suit Jane Doe's needs. The teachers consulted Jane Doe's IEP, and she was switched to Basic Algebra II.

Jane Doe also contends Mr. Wilson, her diesel class instructor, ignored her IEP. (Memo. Contra PageID 2595–97.) But he testified that he kept all of the IEPs in his file cabinet and he would consult them as necessary. (Wilson Dep. 66:12-17.) He also explained that he always had students with IEPs and that the accommodations he provided depended on what each student's IEP required. (*Id.* 41:1–11.) Jane Doe contends she struggled in her diesel class because of her ADHD, and this should have been accommodated. (Memo. Contra. 2595–97.) But the evidence indicates her ADHD diagnosis was in September 2020, after the time that she attended Hi-Point. (Mary Doe Dep., 135:12–137:6, 140:1–141:4; Jane Doe Dep., 138:21–139:9.)

All of this does not demonstrate that Hi-Point failed to provide Jane Doe with readily available accommodations; rather, the evidence indicates Jane Doe's teachers were concerned and trying to figure out how to improve Jane Doe's grades. Jane Doe was only at Hi-Point for two months and while the Court is sympathetic that her time at school was fraught with problems

38

of every kind, she has not shown issues of material fact that the Board could have reasonably accommodated her disability *but refused* to do so. There are not issues of material fact that the accommodations the school provided were unreasonable.

Jane Doe lacks evidence to support essential elements of her disability discrimination claims, and therefore summary judgment on those claims is **GRANTED.**

### III. Substantive Due Process Claim (Count 1) & *Monell* Claim (Count 3)

To start, Jane Doe[15] titles Count 3 as "Unlawful Policy, Practice, or Custom in failing to Respond to Sexual Violence, Harassment, Intimidation, Bullying, Assault/Battery, and Discrimination; 42 U.S.C. § 1983 – *Monell v. Depart. of Social Services*, 436 U.S. 658 (1978)." (Compl. PageID 146.) Jane Doe does not reference a particular constitutional right in connection with her § 1983 claim. Rather, her allegations are about Hi-Point Defendants' policy, practice, or custom and deliberate indifference. (*Id.* ¶¶ 249–61.) Because Jane Doe can only bring her substantive due process claim under the Fourteenth Amendment through § 1983, and *Monell* is a theory of liability rather than a cause of action, the Court will treat Counts 1 and 3 as one claim.

Hi-Point Defendants contend summary judgment should be granted in their favor on Plaintiffs' substantive due process claim because Jane Doe cannot establish that they engaged in conduct that shocks the conscience, or that the state-created danger theory applies. (MSJ PageID 2199.) In response, Plaintiffs only opposes Hi-Point Defendants' Motion regarding the state-created danger theory. (Memo. Contra PageID 2651–54.) They have therefore waived the shocks-the-conscience due process theory. *See Anglers of the Au Sable v. U.S. Forest Serv.*, 565

---

[15] The same standing issues in Plaintiffs' Title IX, ADA, and § 504 claims exist as to Plaintiffs' § 1983 claims. *Foos v. City of Delaware*, 492 F. App'x 582, 592 (6th Cir. 2012) (§1983 standing is limited to plaintiff's with "entirely personal" injuries); *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (explaining there is no § 1983 claim for emotional distress or other "consequent collateral injuries allegedly suffered personally by the victim's family members."). The Court again construes this as Jane Doe's claim.

F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.").

The Fourteenth Amendment's Due Process clause provides that "No State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a claim for a substantive due process violation under 42 U.S.C. § 1983, a plaintiff must establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) that was caused by a person acting under the color of state law. *Embassy Realty Invs., Inc. v. City of Cleveland*, 572 F. App'x 339, 343 (6th Cir. 2014).

The Sixth Circuit's summary of the state-created danger exception in *Richardson v. Huber Heights City School Board of Education* is instructive here:

> Generally, the Due Process Clause does not impose a duty on a school to protect students from harm inflicted by private actors, such as their classmates. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). But "when the State 'cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts,' it has established a 'special danger' and a duty to protect its citizens from that risk." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (alteration in original) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). This exception applies where a state actor "creates a dangerous situation or renders citizens more vulnerable to danger." *Jasinski v. Tyler*, 729 F.3d 531, 538–39 (6th Cir. 2013) (internal quotation marks and citation omitted).
>
> Yet, a danger created by a state actor is not alone enough to hold the Board liable. "Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*"; rather, "[a] plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94); *cf. Caldwell v. City of Louisville*, 120 F. App'x 566, 570–76 (6th Cir. 2004) (applying *Monell* first to establish municipal liability, and then undertaking state-created danger analysis). To establish liability for the Board, Richardson must show "that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 690–91). Such a "custom" must be "so permanent and well settled" as to have the force of law. *Monell*, 436 U.S. at 691,. . . .

40

. . . .

A plaintiff proceeding under a state-created danger theory of liability must show: (1) "an affirmative act by the State that either created or increased the risk" that he would be "exposed to private acts of violence"; (2) a "special danger" to him created by the state action, "as distinguished from a risk that affects the public at large"; and (3) "the requisite state culpability to establish a substantive due process violation." *Jasinski*, 729 F.3d at 539 (quotation omitted). The third prong here amounts to deliberate indifference, which this court has "equated . . . with subjective recklessness"; that is, the state official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006) (quotation marks omitted). Recklessness can be "proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003).

651 F. App'x 362, 365 (6th Cir. 2016); *see McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (discussing the three requirements of the state-created-danger theory). Hi-Point Defendants contend Jane Doe lacks evidence to support her state-created danger theory of substantive due process liability.

## A. Affirmative Acts That Create a Special Danger

Hi-Point Defendants argue that the Board, through its administrators, looked into Jane Doe's complaints of harassment and bullying, implemented several safety precautions, conducted a complete Title IX investigation, suggested safety precautions, and disciplined students. (MSJ PageID 2201–02.) Thus, Hi-Point Defendants contend there is no evidence that Jane Doe was safer before their intervening on her behalf than after. (*Id.*) Plaintiffs counter that Hi-Point Defendants failed to take action and "refused to apply their own policies against sexual harassment, sexual violence, bullying, harassment, intimidation and like conduct, which left Ms. Doe at risk for further harassment." (Memo. Contra PageID 2652.)

To determine whether an affirmative action has increased the danger to an individual, the Court must examine whether the individual was safer before the state action than after it. *Stiles v.*

*Grainger Cnty.*, 819 F.3d 834, 854 (6th Cir. 2016). "Failing to punish or insufficiently punishing assailants is generally not an affirmative act, and, even where it is, it typically does not create or increase the plaintiff's risk of harm." *Id.* (collecting cases). "Even affirmatively returning a victim to a preexisting situation of danger does not create or increase the victim's risk of harm." *Id.* at 855.

As detailed above, the Hi-Point Defendants took substantial action to attempt to make Jane Doe safer at school, including by conducting a Title IX investigation with more than 40 interviews, suggesting and implementing safety precautions, and disciplining students including Minor Student 1. These actions do not amount to affirmative acts to make Jane Doe less safe.

Jane Doe asserts that Hi-Point's Title IX investigation was a "sham," and used to investigate her conduct rather than that of the students harassing her. Jane Doe cites 31 exhibits to support her conclusion. (Memo. Contra PageID 2653 (citing ECF No. 127 Exs. 11, 62, 71, 86, 88, 163, 169, 171, 175, 182, 187, 188, 195, 200, 206, 213, 215, 218, 219, 221, 223, 224, 226, 227, 228, 229, 232, 231, 233, 236, 239).) The Court has reviewed these exhibits, which consist of student incident sheets, Hi-Point's Policy Manual for Sexual Violence, counseling notes, interview notes, and student statement forms in connection with the Title IX investigation, and emails related to the investigation. (*Id.*) Jane Doe cannot explain why these exhibits support her theory that the school's Title IX investigation was a sham. Many of these exhibits support the opposite conclusion—that Hi-Point acted to make Jane Doe safer. For example, Title IX investigation notes show Ms. Ramey asking direct and impartial questions. (*See, e.g.*, ECF No. 127, exhibits containing interview notes.)

While Jane Doe contends that Hi-Point Defendants "refused to apply their own policies" when faced with Jane Doe's situation, the evidence on the record simply does not support her

position. There is little to no doubt that the abuse and harassment Jane Doe testified Minor Student 1 put her through was horrific. (*See* ECF No. 127, Ex. 233; Jane Doe Dep.) But the school did not take an affirmative act that made Jane Doe less safe. It tried to do the opposite.

Jane Doe has pointed to no affirmative acts.

### B. Culpability

Even if Jane Doe could point to affirmative acts on the part of Hi-Point Defendants that created a special danger, she does not have evidence to support the culpability element.

The standard for culpability has been described by the Sixth Circuit as a "high bar." *Doe v. Jackson Local Sch. Dist. Bd. of Ed.*, 954 F.3d 925, 932–33 (6th Cir. 2020). The requisite culpability can be shown by establishing a defendant's conduct was "so outrageous, that it may fairly be said to shock the contemporary conscience," or that the defendant was deliberately indifferent. *Id.* at 933. The deliberately indifference standard for § 1983 claims is substantially the same as the standard for Title IX claims. *Ball v. Olentangy Local Sch. Dist. Bd. of Educ.,* No. 2:20-CV-2681, 2022 WL 594799, at *9 (S.D. Ohio Feb. 28, 2022). The Court has already found there is no issue of material fact as to Hi-Point Defendants' deliberate indifference. *See supra*. Jane Doe points to no behavior on the part of the Board that was outrageous or conscience-shocking.

### C. *Monell*

Even if Jane Doe had shown an underlying constitutional violation connected to her § 1983 claim, she would still fail at holding Hi-Point Defendants liable.

A plaintiff can establish an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or

acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Jane Doe contends scenarios (2) and (4) apply here.

As for (2), Jane Doe points to Dr. Smith, an official with final decision-making authority, as ratifying the following "illegal" actions—(1) the suspension of Jane Doe for the rape she testified to by Minor Student 2 in the diesel lab; (2) the no contact order issued to Jane Doe; and (3) the Title IX report.[16] None of these constitute "illegal acts" as contemplated in *Burgess.* 735 F.3d at 478. Nor is there any evidence on the record that Dr. Smith "ratified" (1) and (2). Dr. Smith was not present for the October 2 meeting where the no contact orders were issued, and he was not involved in suspending Jane Doe and Minor Student 2 because of the tool crib incident—he was only notified of appeals of suspensions. (Smith Dep. 57:19-24, 136:12-137:12, 138:9-24, 150:5-151:8, 160:2-11.)

Moreover, to succeed on its Dr. Smith theory, Jane Doe must show that a "deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Burgess*, 735 F.3d at 479 (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–84 (1986) (plurality opinion).) "Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.* Jane Doe does not assert Dr. Smith was the moving force behind her harm, so this theory fails for that reason, too.

As for (4), Jane Doe claims that Defendants engaged in a custom, policy, or practice of tolerance or acquiescence of federal rights violations. (Memo. Contra PageID 100–01.) A custom of tolerance claim "requires a showing that there was a pattern of inadequately investigating

---

[16] Jane Doe also discusses actions of Defendants Ramey, Harrington, Cook, Gonglik, and Lang. (Memo. Contra PageID 2656.) Nothing in the record suggests that those individual had final decision-making authority.

similar claims." *Burgess v. Fischer*, 735 F.3d at 478. This showing is necessary because "if there was no custom of tolerating inadequate investigations into illegal conduct, the wrongdoer could not have been motivated by a municipal policy in committing the constitutional violation." *Kirk v. Calhoun Cnty.*, Michigan, No. 19-2456, 2021 WL 2929736, at *8 (6th Cir. July 12, 2021). Plaintiffs point to no prior instances of misconduct putting the Board on notice that its training and supervision was deficient or that there was a history of failing to investigate or discipline. (Memo. Contra PageID 100–01.) So, this theory fails.

Summary judgment as to Counts 1 and 3 as to the Board and individual Hi-Point Defendants in their official capacity[17] is **GRANTED**.

### D. Individual Liability

Jane Doe also sued the individual Hi-Point Defendants in their individual capacities. (Compl.) The individual Hi-Point Defendants assert they are entitled to qualified immunity because Jane Doe failed to establish a violation of any of their constitutional rights. (MSJ PageID 2212–13.) Jane Doe counters that she has substantive due process and equal protection rights and that those rights are clearly established. (Memo. Contra PageID 2659–60.)

Courts use a two-part test to determine whether a government official is entitled to qualified immunity. First, they determine whether "the official's conduct violated a constitutional right." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Next, if the answer is yes, courts "must determine if the right was clearly established at the time of the violation." *Id.*

---

[17] *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (explaining that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and so are "to be treated as a suit against the entity").

For all the reasons state above, Jane Doe has failed to demonstrate Hi-Point Defendants violated a constitutional right. Jane Doe singles out no individual Hi-Point Defendant; put another way, she does not argue that any individual Hi-Point Defendant violated a constitutional right through his or her actions separate from the school.

Summary judgment on Counts 1 and 3 is **GRANTED.**

### State Law Claims

United States district courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court has original jurisdiction over some claims in the action, it can exercise supplemental jurisdiction over additional claims part of the same case or controversy. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Harper v. Auto All. Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir. 2004) (holding that claims are part of the same case or controversy if they derive from a "common nucleus of operative facts").

But supplemental jurisdiction is a matter of judicial discretion and "need not be exercised in every case in which it is found to exist." *United Mine Workers of Am.*, 383 U.S. at 726. And where "federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009).

The Court finds that exercising supplemental jurisdiction over Plaintiffs' state-law claim after dismissing the federal claims would not serve judicial economy, convenience, or comity, and therefore declines to do so. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). The state court is better equipped to interpret Plaintiff's claims under the Ohio Revised Code and state common law.

Because Plaintiffs' federal claims do not survive Defendants' Motion for Summary Judgment, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state-

law claims and **DISMISSES** them **WITHOUT PREJUDICE**, pursuant to 28 U.S.C.

§ 1367(c)(3).

**State Farm Intervenor**

Because Plaintiffs only bring state-law claims against Minor Student 2, and the Court has

declined to exercise supplemental jurisdiction over such claims, State Farm's Motion for Default

Judgment or Motion for Summary Judgment (ECF No. 54) and Reply (ECF No. 105) are

**DENIED AS MOOT.**

**CONCLUSION**

The Court **GRANTS** the Motion for Summary Judgment on Plaintiffs' federal claim, and

**DECLINES** to exercise supplemental jurisdiction over Plaintiffs' state-law claims and

**DISMISSES** them **WITHOUT PREJUDICE.** (ECF No. 122.) The Court **DENIES** the Motion

to Strike (ECF No. 141), and **DENIES AS MOOT** State Farm's Motion for Default Judgment

and/or Summary Judgment (ECF No. 54) and Reply (ECF No. 105).

The Clerk is **DIRECTED** to enter judgment and **CLOSE** the case.


**IT IS SO ORDERED.**

<u>2/12/2024</u>                             <u>s/Edmund A. Sargus, Jr.</u>
DATE                                  EDMUND A. SARGUS, JR.
                                      UNITED STATES DISTRICT JUDGE